UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **KIMBERLY DOTSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) No. 3:15-00306 |
| | ) **Judge Nixon/Brown** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **ACTING COMMISSIONER** | ) |
| **OF SOCIAL SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

**To: The Honorable John T. Nixon, Senior United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner, denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 18) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on April 19, 2011 (Doc. 14, pp. 82-85, 190), alleging a disability onset date of February 18, 2009 (Doc. 14, pp. 144, 151, 189).[1] Plaintiff claimed she was unable to work because of fibromyalgia, back pain, vertigo, diabetes, gout, rheumatoid arthritis,

---

[1] References to page numbers in the administrative record (Doc. 14) are to the page numbers that appear in bold in the lower right corner of each page.

carpal tunnel syndrome, brain fog, obesity, myalgia, vision, and sleep problems. (Doc. 14, pp. 86, 91, 99-100, 180) Plaintiff's application for benefits was denied initially on September 13, 2011 (Doc. 14, pp. 87-91), and upon reconsideration on January 19, 2012 (Doc. 14, pp. 95-98). On March 14, 2012, plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 14, pp. 104-06) A hearing was held in Nashville on August 5, 2013 before ALJ Shannon Smith. (Doc. 14, pp. 30-52) The ALJ entered an unfavorable decision on October 1, 2013 (Doc. 14, pp. 12-29), after which plaintiff filed a request with the Appeals Council on December 3, 2013 to review the ALJ's decision (Doc. 14, pp. 7-11). The Appeals Council denied plaintiff's request on January 23, 2015 (Doc. 14, pp. 1-6), whereupon the ALJ's decision became the final decision of the Commissioner.

Plaintiff brought this action through counsel on March 26, 2015 (Doc. 1), following which she filed a motion for judgment on the administrative record on September 2, 2015 (Doc. 18). The Commissioner responded on October 20, 2015 (Doc. 22), and plaintiff replied on October 26, 2015 (Doc. 23). This matter is now properly before the court.

## II. EVIDENCE[2]

Dr. Robert Cochran, Jr., M.D., examined plaintiff on November 9, 2004 on referral from Dr. Burton Sanders, M.D.[3] Dr. Cochran wrote a report to Dr. Sanders following his November 9, 2004 examination of plaintiff, which included the following:

> On examination . . . [t]here is a certain poverty of psychomotor activity, and her affect is flat. Cognition is normal. Gait and station are normal. The heart and lungs are clear, and EKG done in anticipation of . . . therapy is not remarkable. There is only modest tenderness to palpation over the muscles of the neck, shoulders, and

---

[2] The excerpts of the administrative record referred to below are those necessary to respond to plaintiff's motion for judgment on the administrative record. The remainder of the record is incorporated herein by reference.

[3] The March 10, 2010 Adult Disability Report shows that Dr. Sanders treated plaintiff from 2005 to 2008. (Doc. 14, p. 186) Although Dr. Sanders name features prominently in the record in connection with referrals/consults, there are no clinical notes in the record that are attributable directly to him.

> back. Deep tendon reflexes are preserved and symmetric. Sensation is normal.

(Doc. 14, p. 345)

A MRI of plaintiff's thoracic spine was performed at the request of Dr. Sanders on September 2, 2005. (Doc. 14, p. 267) The following was recorded in the MRI report:

> Findings: The spinal cord is normal. Anatomic alignment of vertebral bodies. No fractures. The disk levels are normal. There is no spinal or foraminal stenosis[4] or disk herniation.
>
> Impression: Normal.

(Doc. 14, p. 267) A MRI of the lumbar spine was performed on the same date, also at the request of Dr. Sanders. The results recorded in the MRI report were as follows:

> Findings: The spinal cord conus[5] is normal, terminating at T12-L1. Anatomic alignment of vertebral bodies. No fractures. The disk levels are normal. There is no spinal or foraminal stenosis or disk herniation.
>
> Impression: Normal.

(Doc. 14, p. 270)

A CT scan of plaintiff's head and brain was made on December 30, 2008 at the request of Nurse Practitioner (NP) April Collier, MSN, FMNP.[6] (Doc. 14, p. 363) The impression was, "Normal head CT with and without contrast." (Doc. 14, p. 363) A CT scan of plaintiff's sinuses was made that same day, also at the request of NP Collier, the results of which were as follows:

---

[4] Foramen – "a natural opening or passage, especially one into or through a bone." *Dorland's Illustrated Medical Dictionary* 729 (32nd ed. 2012). Stenosis – an abnormal "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space . . . ." *Dorland's* at 1769.

[5] Conus medullaris – "the cone-shaped lower end of the spinal cord . . . ." *Dorland's* at 411.

[6] The Adult Disability Report shows that plaintiff first visit to the Hope Family Medical Clinic – where NP Collier was employed – was in 2008, and her last visit was in October 2009. (Doc. 14, pp. 185-86) The first record in which NP Collier appears to have treated plaintiff is dated December 23, 2008. (Doc. 14, p. 336)

1.      Slight nasal mucosa nodularity,[7] which could indicate minimal allergic rhinitis[8] in the correct clinical setting.

          2.      Minimal nasal septal deviation.[9]

          3.      Otherwise, negative sinus CT.

(Doc. 14, p. 364)

Xrays of plaintiff's chest were made on January 7, 2009 at the request of NP Collier in connection with plaintiff's complaint of chest pain. (Doc. 14, p. 362) The findings were as follows: "No focal infiltrates. The heart and mediastinal[10] structures and visualized bony thorax appear unremarkable." (Doc. 14, p. 362) The formal impression was, "No acute disease." (Doc. 14, p. 362)

Dr. Paul Wheeler, M.D., examined plaintiff January 13, 2009 for arthralgia and myalgia on referral from NP Collier. (Doc. 14, pp. 371-72) Dr. Wheeler's physical examination of plaintiff was unremarkable, and he determined that plaintiff was "negative" for the "review of systems . . . . in this interview . . . with the exception of high blood pressure for which she takes medications, occasional tinnitus, and occasional headaches," and that she "did not have findings to suggest inflammatory disease on exam today." (Doc. 14, pp. 371-72)

A bilateral lower extremity venous ultrasound was performed on February 4, 2009 with NP Collier listed as plaintiff's physician. (Doc. 14, p. 293) The results of the ultrasound were as

---

[7] Mucosa – "a membrane . . . ." *Dorland's* at 1186, 1989. Nodule – "a small . . . node ['a small mass of tissue in the form of a swelling, knot, or protuberance'] that is solid and can be detected by touch. *Dorland's* at 1279, 1282.

[8] Rhinitis – "inflammation of the mucus membrane of the nose." *Dorland's* at 1639.

[9] Septal – "a dividing wall or partition . . . ." *Dorland's* at 1693.

[10] Mediastinal – "the mass of tissues and organs separating the two plural sacs, between the sternum anteriorly ['situated in front'] and the vertebral column posteriorly . . . [that] . . . contains the heart . . . and other structures and tissues." *Dorland's* at 98, 1118.

4

follows:

> Right Lower Extremity:
>
> . . . . No evidence of deep venous thrombosis from the level of the common femoral vein to popliteal vein is seen. Within the calf, the distal posterior tibial veins appear normal. The greater sapherous vein appears patent[11] at the level of its junction with the femoral vein.
>
> Left Lower Extremity:
>
> . . . . No evidence of deep venous thrombosis from the level of the common femoral vein to popliteal vein is seen. Within the calf, the distal posterior veins appear normal. The greater sapherous vein appears patent at the level o[f] its junction with the femoral vein.
>
> Impression: No back pain. Leg and arm pain[.]

(Doc. 14, p. 293)

A bilateral upper extremity arterial Doppler examination was performed on February 5, 2009 with NP Collier listed as plaintiff's physician. (Doc. 14, p. 292) The impression from the examination was as follows: "On the RIGHT, the findings do not suggest significant inflow anomaly. On the LEFT, the findings do not suggest significant inflow anomaly."[12] (Doc. 14, p. 292)

A MRI of plaintiff's lumbar spine was made on February 6, 2009 with NP Collier listed as plaintiff's physician. (Doc. 14, p. 287) The results of the MRI were as follows:

> Findings: The lumbar vertebra are in anatomic alignment. Normal vertebral body height is present. The marrow signal within the visualized osseous[13] structures within normal limits for patient's age and gender. The conus medullaris terminates at the T12-L1 level.

---

[11] Patent – "open, unobstructed, or not closed." *Dorland's* at 1395.

[12] The specific/detailed findings are not noted here because of the technical nature of the terminology.

[13] Osseous – "pertaining to bone . . . ." *Dorland's* at 1343.

       No intrathecal[14] mass is seen.

       T12-L1: Normal.

       L1-L2: Normal.

       L2-L3: Normal.

       L3-L4: Normal.

       L4-L5: Minimal spondylitic[15] disc bulge is seen without significant central canal or neural foraminal stenosis.

       L5-S1: Normal.

       Impression: Minimal L4-5 discogenic[16] disease without central canal or neural foraminal stenosis.

(Doc. 14, p. 287)

A MRI of plaintiff's thoracic spine was made on February 6, 2009, again with NP Collier identified as plaintiff's physician. (Doc. 14, p. 289) The results of that MRI were as follows:

       Findings: The thoracic vertebra are in anatomic alignment. Normal vertebral body height is present. The marrow signal is within normal limits for the patient's age and gender. The disc spaces are normal at each level. There is no central canal or neural foraminal stenosis. Normal T2 signal is identified within the thoracic cord. No intrathecal masses seen.

       Impression: Normal MRI of the thoracic spine.

(Doc. 14, p. 289)

An arterial Doppler examination of plaintiff's lower extremities was performed on February 6, 2009. (Doc. 14, p. 290) Exercise responses were normal, and the formal impression in the report

---

[14] Theca – the "enclosing case or sheath" of the spinal cord. *Dorland's* at 1908.

[15] Spondylolysis – "dissolution of a vertebra . . . ." *Dorland's* at 1754.

[16] Discogenic – "caused by derangement of an intervertebral disk." *Dorland's* at 527.

was "[n]o findings to indicate significant peripheral arterial disease." (Doc. 14, p. 290)

Radiographs were made of plaintiff's lumbar spine on July 28, 2009 on referral from NP Lauren Henske. (Doc. 14, p. 462) The results were as follows:

> FINDINGS:
> Alignment: Normal
> Vertebral body heights/Disk spac[e]s: Mild disc space narrowing at
> L4-L5 and L5-S1.
> Fractures: None
> Facets: Mild facet arthropathy[17] in the lower lumbar spine.
> Bone mineralization: Normal.
>
> IMPRESSION: Lumbar spondylosis as above.

(Doc. 14, p. 462)(bold and italics omitted) Radiographs were made of plaintiff's right hip that same day. (Doc. 14, p. 448) The impression in the report was that the "[t]he right hip joint appear[ed] normal," with "mild degenerative changes involving the right sacroiliac joint." (Doc. 14, p. 448)

Radiographs were made of plaintiff's right shoulder on July 31, 2009 on referral from NP Henske. (Doc. 14, p. 338) The impression was, "[n]ormal right shoulder radiographs." (Doc. 14, p. 338)(italics omitted) Radiographs were made of plaintiff's right humerus[18] that same day. (Doc 14, p. 339) The impression was a "[n]ormal Examination." (Doc. 339)(italics omitted)

Radiographs were made of plaintiff's right foot on August 27, 2009 on referral from NP Collier. (Doc. 14, p. 340) The impression in the report was that plaintiff had a "[s]mall plantar calcaneal spur." (Doc. 14, p. 340)(bold and italics omitted) Other radiographs performed that same day revealed "minimal osteoarthritic change involving the first MTP joint,"[19] and a "small plantar

---

[17] Arthropathy – "any joint disease." *Dorland's* at 158.

[18] Humerus – "the bone that extends from the shoulder to the elbow . . . ." *Dorland's* at 873.

[19] MTP [metatarsophalangeal] joints – pertaining to the "part of the foot between the tarsus [the ankle] and the toes, its skeleton being the five long bones . . . from the tarsus to the phalanges [toes]." *Dorland's* at 1145, 1424, 1873.

calcaneal spur," otherwise the imaging was normal. (Doc. 14, p. 341)

NP Collier submitted a medical opinion on March 31, 2010 "in reply to [a] disability determination by the State of Tennessee." (Doc. 14, pp. 396-462) NP Collier noted that plaintiff had the following conditions: chronic pain, morbid obesity, muscle spasms, anxiety, and depression. (Doc. 14, p. 396) NP Collier assessed plaintiff with less than sedentary residual functional capacity (RFC), *i.e.*, she opined that, in an 8-hr. workday, plaintiff could hear 100% of the time, speak 80% of the time, sit 30% of the time, but had <u>zero</u> ability to stand, walk, lift, carry, handle objects, or travel. (Doc. 14, p. 396) NP Collier closed her report with the following statement on the signature page: "Please refer to the medical records attached for specific details regarding the patient's illnesses and ongoing treatment plan. . . ." (Doc. 14, p. 397)

### III. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

### IV. ANALYSIS

#### A. Standard of Review

8

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

## B. Claims of Error

### 1. Whether the ALJ Erred in Not Considering All of Plaintiff's Severe Impairments
(Doc. 19, pp. 6-7)

Plaintiff argues that the ALJ erred in not finding rheumatoid arthritis, diabetes mellitus, diabetic neuropathy, and insomnia to be severe impairments, and for not giving sufficient reasons for not finding these symptoms/limitations to be severe. The record shows that the ALJ did not identify/list the foregoing as severe impairments.

The ALJ's failure to include these additional conditions as among plaintiff's severe impairments constitutes harmless error, because the ALJ determined that plaintiff had other severe impairments that permitted her to clear step two. *See Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008)(citing *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)(failure to find that an impairment was severe at step two was harmless error where other impairments were deemed severe.) Plaintiff's first claim of error is without merit.

### 2. Whether the ALJ Erred in Not Including a Function-by-Function Assessment in the RFC Analysis
(Doc. 19, pp. 7-8)

9

Plaintiff makes two arguments in her second claim of error. First, she argues that the ALJ failed to make a function-by-function assessment of plaintiff's alleged exertional and non-exertional limitations. (Doc. 19, p. 7) Second, she argues that the ALJ failed to include substantial limitations in the RFC assessment "correlating to symptoms and limitations which were well-documented in the record." (Doc. 19, pp. 7-8)

Turning to plaintiff's first argument, "'although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing,' as there is a difference 'between what an ALJ must consider and what an ALJ must discuss in a written opinion.'" *Beason v. Comm'r of Soc. Sec.*, 2014 WL 4063380 * 13 (E.D. Tenn. 2014)(citing *Delgado v. Comm'r of Soc. Sec.*, 30 Fed.Appx. 542, 547 (6th Cir. 2002)). More particularly, SSR 96-8p "does not state that the ALJ must discuss each function separately in the narrative of the ALJ's decision." *Beason*, 2014 WL at *13. In the instant case, the ALJ noted affirmatively three times that she had considered "the entire record." (Doc. 14, pp. 15, 17-18) That is all the ALJ was required to do.

As to the second argument, plaintiff has failed to provide any factual allegations to support her argument that the ALJ failed to include substantial limitations in the RFC assessment "correlating to symptoms and limitations which were well-documented in the record." More particularly, plaintiff has failed to identify those symptoms and limitations to which she is referring. The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"). Consequently, this argument is waived. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Erred in Failing to Consider and Weigh Properly the Opinion of Nurse Practitioner Collier (Doc. 19, pp. 8-12)

Plaintiff makes the following arguments in support of her third claim of error: 1) the ALJ erred in determining that NP Collier's opinion "was based on the subjective complaints of the claimant," because there is no statement from NP Collier in the record to that effect; 2) the ALJ erred in rejecting NP Collier's opinion "because it was not from an acceptable medical source . . . ."; 3) the weight the ALJ gave to NP Collier's opinion was conflicting and inconsistent; 4) the ALJ failed to follow the rules in SSR 06-3p for evaluating an opinion provided by a nonacceptable medical source.[20]

"Acceptable medical sources" who can provide evidence to establish a disabling impairment include "[l]icensed physicians (medical or osteopathic doctors)," and "[l]icensed or certified psychologists." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). NP Collier is neither. However, "other sources" such as NP Collier may provide evidence "to show the severity of [an] impairment and how it affects [a claimant's] ability to work." 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). Although the opinions of "other sources" "cannot establish the existence of a medically determinable impairment," the perspective of "other sources" should be given weight by the ALJ, and "evaluated on key issues such as impairment severity and functional effects along with the other evidence in

---

[20] Plaintiff presents these arguments in a different order in her supporting memorandum. The order has been changed in the R&R to reflect a more logical treatment of her arguments.

the file." SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

The ALJ has the "discretion to determine the proper weight to accord opinions from 'other sources' . . . ." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d, 541 (6th Cir. 2007). The factors to be considered in evaluating evidence provided by other sources include: 1) the examining relationship; 2) the treatment relationship; 3) the length of the relationship; 4) the nature and extent of the treatment relationship; 5) the supportabilty of the opinion; 6) the consistency of the opinion with the record as a whole; 7) specialization; 8) other factors. C.F.R. § 404.1527(c)(1)-(3). That said, SSR 06-03p also provides the following:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these 'other sources, **or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case**.

*Cruse*, 502 F.3d at 541 (quoting SSR 06–03P)(emphasis added) Harmless error may be found where the Commissioner has met the goal of C.F.R. § 404.1527(d) even though he has not complied with the terms of the regulation. *See Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011).

The ALJ referred to NP Collier only twice in his decision, once by name and once by inference. The first statement is as follows:

> Little weight is accorded Dr. Patel's limitations for the reasons given above, as well as those of Nurse Practitioner Collier, who is not a medically acceptable source. Both assessments appear to be based on the subjective complaints of the claimant, and are not consistent with the medical evidence of record.

(Doc. 14, p. 18) The second statement is as follows:

> A nurse practitioner [NP Collier] from that clinic stated in March 2010 that the claimant could do no standing, walking, or lifting and could sit 30% of a workday, based on chronic pain, morbid obesity,

12

> muscle spasms, anxiety and depression. Exhibits 5F, 7F, and 8F. No weight is accorded to that opinion, because it is not from an acceptable medical source according to Social Security regulations, and it is based on symptoms rather than diagnoses. Those limitations are not supported by the medical evidence of record.

(Doc. 14, p. 19)

Plaintiff asserts in her first argument that there is no statement from NP Collier that her opinion was based on the plaintiff's subjective complaints. Although it is true that there is no separate, stand-alone statement from NP Collier to that effect, NP Collier specifically directed the State of Tennessee – the recipient of her written opinion – "to the medical records attached for specific details regarding the patient's illnesses and ongoing treatment plan." (Doc. 14, p. 397)

The attached medical records comprise pages 3-67 of the 67-page Ex. 8F. Pages 3-67 of Ex. 8F can be divided into five categories: 1) NP Collier's clinical notes; 2) reports of imaging ordered by NP Collier; 3) reports of laboratory tests ordered by NP Collier; 4) reports from other medical providers; 5) miscellaneous documents.

NP Collier's clinical notes (Doc. 14, pp. 398-99, 402, 405-08, 412-13, 420-23, 425–26) all appear to be based on plaintiff's subjective representations. Why? Because there is no actual or implied reference in them to any objective medical evidence. Although NP Collier's clinical notes are sketchy at best, a reasonable person may infer from them that NP Collier's entries derived from plaintiff's subjective representations.

The imaging reports attached to NP Collier's opinion (Doc. 14, pp. 403–04, 434-35, 448-59, 462) include each of the reports discussed above at pp. 3-8. As previously noted, the results of these medical and diagnostic tests ranged from normal/none/unremarkable, to minimal/not significant, to mild. The results of the imaging studies ordered by NP Collier are inapposite to her opinion, so much so that one is left with the impression that NP Collier's opinion and the imaging reports

13

attached to her opinion pertain to two different people.

There are four laboratory reports attached to NP Collier's opinion dated December 26 and 31, 2008, January 3 and June 27, 2009. (Doc. 14, pp. 427-33) Handwritten notes on the December 26, 2008 laboratory report show that plaintiff's cholesterol and sugar were elevated, but not so high that medication was required, and that "more blood & possible referral" were needed to evaluate an elevated ANA screen.[21] (Doc. 14, pp. 432-33) The December 31, 2008 report confirmed the elevated ANA (Doc. 14, p. 431), and plaintiff was referred to Dr. Wheeler whose report, discussed above at p. 4, was negative. The January 3, 2009 laboratory report was normal, and the June 27, 2009 laboratory report was unremarkable as well. (Doc. 14, pp. 427-30) In short, there is nothing in the laboratory reports in Ex. 8F that support NP Collier's opinion.

The reports of Drs. Wheeler and Cochran are included in the record that NP Collier attached to her opinion. Dr. Wheeler's report, written pursuant to an examination that stemmed from plaintiff's elevated ANA, was a negative report. (Doc. 14, pp. 418-19) Dr. Cochran's clinical notes, covering the period November 9, 2004 to June 9, 2005, all are based on plaintiff's subjective representations.[22] (Doc. 14, pp. 438-390, 440-47) Again, there is nothing in these reports that supports NP Collier's opinion.

Finally, there are several miscellaneous documents attached to NP Collier's opinion. (Doc. 14, pp. 400-01, 409-11, 414-17, 424, 436-37, 461) These documents comprise referrals, appointment notices, insurance correspondence, and pre-authorization facsimiles, none of which provide any evidence relevant to plaintiff's alleged symptoms and/or conditions. Once again, there is nothing in these documents that support NP Collier's opinion.

---

[21] The handwritten notes appear to be signed by NP Collier.

[22] There is a strip chart in Dr. Cochran's reports of an ECG (echocardiogram) on November 9, 2004. (Doc. 14, p. 445) The ECG was normal.

14

As shown above, the subjective symptoms/complaints reflected in NP Collier's clinical notes are the only records in Ex. 8F that might conceivably apply to NP Collier's opinion that plaintiff was disabled. In other words, even though the record does not include a separate, stand-alone statement executed by NP Collier that her opinion was based on plaintiff's subjective complaints, the records attached to her opinion support the logical conclusion that it was.

Plaintiff asserts in her second argument that the ALJ erred in rejecting NP Collier's opinion "because it was not from an acceptable medical source . . . ." As shown above at pp. 12-13, the record shows that the ALJ noted twice that plaintiff was not an acceptable medical source, *i.e.*, in the first instance that NP Collier "is not a medically acceptable source" and, in the second instance, that "[n]o weight [wa]s accorded to [NP Collier's] opinion, because it is not from an acceptable medical source according to Social Security regulations . . . ."

In the first instance, the ALJ simply stated that NP Collier "is not a medically acceptable source." This is a statement of fact. There is no error here.

As for the second instance, the undersigned assumes without deciding that the ALJ actually meant that she was not required to give any weight to NP Collier's opinion "because it was not from an acceptable medical source according to Social Security regulations . . . ." If true, this is an improper reading of the regulations. That said, however, even if that was what the ALJ actually thought/meant, the ALJ's statement amounted to nothing more than harmless error. More particularly, the decision shows that the ALJ did, in fact, take NP Collier's opinion into consideration as evidenced in her first statement that NP Collier's "assessments appear to be based on the subjective complaints of the claimant, and are not consistent with the medical evidence of record," and in her second statement that NP Collier's opinion was "based on symptoms rather than diagnoses . . . [and that those] . . . limitations are not supported by the medical evidence of record."

15

Plaintiff alleges in her third argument that the ALJ erred in giving conflicting and inconsistent weight to NP Collier's opinion, in the first instance according it "little weight," and "no weight" in the second. The record supports plaintiff's argument that the ALJ gave "conflicting and inconsistent" weight to NP Collier's opinion. However, apart from asserting that the weights are "conflicting and inconsistent," plaintiff provides no supporting argument to show that the "conflicting and inconsistent" weight inured to her disadvantage. Because this argument is nothing more than a naked claim, it is conclusory and, as such, it is waived for reasons previously explained.

Plaintiff's final argument is that the ALJ failed to follow the rules in SSR 06-3p for evaluating an opinion provided by a nonacceptable medical source. The record shows that the ALJ did not address the 8 factors enumerated above at p. 12 in evaluating NP Collier's opinion. However, the ALJ did comply with SSR 06-03p in that she otherwise "ensure[d] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning . . . ." The ALJ discounted NP Collier's opinion because it was based on plaintiff's subjective complaints, and was inconsistent with the objective medical evidence of record. That was sufficient for plaintiff and/or any subsequent reviewers to follow the ALJ's reasoning.

Plaintiff's third claim of error is without merit.

## IV. CONCLUSION
## AND
## RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's amended motion for judgment on the administrative record (Doc. 14) be **DENIED**, and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party

shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 28th day of July, 2016.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge